UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID MORRIS,

    Plaintiff,

vs.                                           Case No. 8:07-cv-845-T-27-TBM

PARADISE OF PORT RICHEY,
INC.; et al.,

    Defendants.
_____/

## PLAINTIFF'S POST-TRIAL BRIEF

Plaintiff, DAVID MORRIS, submits the following Post-Trial Brief:

I.     **LIABILITY.**

This Court has jurisdiction over this admiralty case. 29 U.S.C. § 1333 (2004). Around 4:45 p.m. on March 19, 2005, Captain Craig Matthews brought a vessel, the Purseverance, along side a casino boat, the Horizon's Edge, in a shallow part of the Gulf of Mexico known as the "peanut." [Matthews/Morris/P2]. The waters were calm. [Matthews/Morris]. A gangway was placed between the vessels to transfer crew and passengers. [Matthews/Morris]. After the gangway was tied down, a strong, unexpected wave struck the attached vessels. [Matthews/Morris]. Captain Matthews ordered the four seamen, including David Morris, to pull in the gangway. [Morris]. While the seamen pulled in the gangway around 5:00 p.m., a second wake hit the vessels. [Matthews/Morris]. The wakes were at least two feet in height. [Ceely]. The second wake caused the Purseverance to surge forward. [Matthews/Morris/Ceely]. When the second wake hit, the attached vessels moved, and the gangway pinched both of Morris' legs against the bulkhead of the Horizon's Edge. [Morris].

Captain Matthews and First Mate McKenzie saw another ship, the Pink Lady II, throwing

a wake approximately 1,000 feet away. [Matthews/McK]. Captain Matthews radioed the Pink Lady II. [Matthews/McKenzie]. Captain Mario Rocamora answered the call and apologized for the situation. [Matthews/McKenzie]. Although Rocamora does not recall the incident, his overall memory was poor. [Rocamora]. His log times were inaccurate, but placed the Pink Lady II in the vicinity of the other ships when the injury occurred. [Rocamora/Ceely]. Captain Rocamora operated the Pink Lady II as a passenger shuttle for the Royal Casino I, another gambling boat, which also used the shallow seas around the "peanut." [Rocamora]. Rocamora routinely operated the Pink Lady II near the Purseverance and had himself previously worked for Captain Matthews. [Matthews/Rocamora]. A maritime expert, Captain Henry Ceely, opined that the Pink Lady II violated a host of nautical rules; thereby creating the dangerous wake which injured Morris. [Ceely].

Under general maritime law, the fact that the Pink Lady II's wake caused injury to Morris established a prima facie case of negligence. West India Fruit & S.S. Co. v. Raymond, 190 F.2d 673, 674 (5th Cir. 1951). The Pink Lady II must exonerate herself by proving that she could not have prevented the injury through practical precautions. Alamia v. Chevron Transporation Corp., 660 F.Supp. 1123, 1124-25 (S.D.Miss. 1987). The Pink Lady II did not sustain her burden. At the time of the injury, Morris was moving a gangway between attached vessels, whose ability to maneuver was limited. [Matthews/Morris/Ceely]. The attached vessels should have been readily visible to the approaching Pink Lady II from 1,000 feet away in calm seas. [Matthews/Morris/Ceely]. Liability for a dangerous wake has been found against a ship which passed within a half mile of another craft. See, e.g., The Majestic, 48 F. 730, 732 (2d Cir. 1891). Given the facts before this Court, the Pink Lady II failed to keep a proper lookout. Anthony v. International Paper Co., 289 F.2d 579, 581 (4th Cir. 1961) (finding liability where a tug boat's wake swamped a motor boat). The Pink Lady II

proceeded unnecessarily close to the Purseverance while the gangway was in use. Moran v. The M/V Georgie May, 164 F.Supp. 881, 884 (S.D.Fla. 1958) (finding liability on similar facts). The Pink Lady II failed to use reasonable precautions to avoid having her wake injure a crewman on a nearby vessel. Compare, The Rotherfield, 123 F. 460, 461 (S.D.Ala. 1903) (finding liability on similar facts). The Pink Lady II's wake proximately caused the knee injuries to David Morris when the Purseverance surged forward, pinching his legs between the gangway and the bulkhead. Since Morris was following an order from Captain Matthews at the time, Morris cannot be found comparatively negligent. Williams v. Brasea, Inc., 497 F.2d 67, 73 (5th Cir.), cert. denied, 423 U.S. 906 (1974); Hall v. American Steamship Co., 688 F.2d 1062, 1065 (6th Cir. 1982). Pursuant to a partial judgment as a matter of law granted at the close of Plaintiff's case-in-chief, this Court will not consider the comparative negligence of any third parties. Drake Towing Company, Inc. v. Meisner Marine Construction Co., 765 F.2d 1060, 1068 (11th Cir. 1985).

## II. DAMAGES.

After the surging ship pinched his legs against the bulkhead, Morris fell to the deck. [Morris]. The first mate saw Morris writhing in pain. [McKenzie]. Several people carried Morris from the Horizon's Edge back to the Purseverance which then headed for shore. [Morris]. At the docks, an ambulance took Morris to Helen Ellis Memorial Hospital. [Morris/Morris]. Morris received shots of Morphine for his pain. [Morris]. At the hospital, he was diagnosed with a "crush injury" to his knees. [Morris/Ferderigos/P36]. Morris then saw an orthopedist, Robert Swiggett, M.D., for several months. [Swiggett]. Morris used a walker to get around. [Morris/Morris]. His right knee buckled. [Swiggett/Morris/P37/P42]. His right knee clicked. [Morris]. On April 20, 2005, the patellar grind test aggravated his symptoms. [Swiggett/P40]. Dr. Swiggett ordered an MRI scan of the right knee,

3

which showed "moderate chondromalacia patella overlying the medial facet of the patella." [Swiggett/P37]. Morris did not have any problems with his knees before the boating accident of March 19, 2005. [Morris/Morris/Swiggett/Ferderigos].

In June of 2005, Dr. Swiggett released Morris from his care to return to work without restrictions. [Swiggett]. In August of 2005, Morris returned to work as a seaman. [Morris/Morris/P23]. During his period of convalescence from March to August of 2005, Morris struggled to pay his bills and borrowed money from his father. [Morris/Morris/P27/P29]. Past medical bills for the ambulance and a knee brace remain unpaid. [Morris/P34]. From 2005 through the present, Morris has worked as a seaman with various employers. [Morris/Morris/Eastridge/P23/P24/P26/P31]. An economist, Joyce Eastridge, computed his past lost earnings and loss of future earning capacity. [Eastridge]. Eastridge based the computation of lost future earning capacity on opinions rendered by an independent medical examiner, Fred Ferderigos, M.D. [Eastridge/Federigos].

In February of 2008, Dr. Ferderigos examined David Morris. [Morris/Ferderigos]. Dr. Ferderigos is a board certified orthopedic surgeon with a current medical practice, and he performs knee surgery. [Ferderigos]. During his physical exam, the doctor found pain, stiffness, and grinding in Morris' right knee. [Ferderigos]. He concurred in the diagnosis of chondromalacia patella of the right knee. While the knee had nearly a full range of motion, the cartilage underneath the right knee cap had been damaged. [Swiggett/Ferderigos]. Dr. Ferderigos could not rule out a meniscal tear. [Federigos]. The doctor opined that Morris' knee will become arthritic and that he will need injections and an arthroscopic surgery. [Federigos]. Including charges for the surgeon, for the anesthesia, and for the surgical facility, the global cost of the arthroscopy will be $25,000.00.

4

[Federigos] Within a reasonable degree of medical probability, Dr. Ferderigos testified that Morris will also need a right knee replacement between the ages of 50 and 60 with a possible revision of that procedure. [Ferderigos]. The first knee replacement will globally cost $25,000.00 to $30,000.00 without complications, and a revision will cost more. [Federigos].

Based on the testimony and on the exhibits received into evidence, David Morris requests the following damages:

**A. PAST MEDICAL EXPENSES:** Morris claims **$532.00** in past medical expenses: $472.00 for the ambulance bill and $60.00 for the knee brace. [Morris/Morris/P34].

**B. FUTURE MEDICAL EXPENSES:** Based on Dr. Ferderigos' testimony, Morris claims **$50,000.00** in future medical expenses: $25,000.00 for an arthroscopy and $25,000.00 for one knee replacement. He chooses not to request monies for a second knee replacement. The present value of these damages will be offset by inflation.

**C. PAST LOST WAGES:** The economist, Joyce Eastridge, computed past lost wages from March 19, 2005, until August 2005 in the range of $13,000.00 to $18,160.00. [Eastridge]. While the owner of the Horizon's Edge ceased operations in May of 2005, Morris would promptly have found other higher-paying work based on his employment history. [Morris/Eastridge]. Thus, he claims past lost wages of **$15,000.00**. Prejudgment interest is warranted. Sunderland Marine Mutual Insurance Co., Ltd. v. Weeks, 338 F.3d 1276, 1280 (11th Cir. 2003).

**D. LOST FUTURE EARNING CAPACITY:** Joyce Eastridge computed future lost earnings in the range of $260,026.00 to $394,376.00 at present value based on Morris' work life expectancy to age 65. [Eastridge]. Eastridge assumed that Morris will leave sea duties at age 50 due to the knee replacement and then return to work as a bartender at $20,000 less per year. [Eastridge].

Dr. Frederigos testified that Morris will require a knee replacement between the ages of 50 and 60; and Morris should not return to work as a seaman. [Ferderigos]. Morris claims damages for lost earning capacity only from age 57.5 to age 65 at present value of **$150,000.00**.

E. **NON-ECONOMIC DAMAGES**: Morris was writhing in pain on the ship. The diagnosed knee injuries then caused continued pain, stiffness, clicking, and grinding. The knee buckled due to pain reflexes. Morris received Morhphine shots and took strong pain medication. He went through physical therapy. He used a walker for several months. His knee is arthritic. He went through financial distress due to his convalescence in 2005. He borrowed money to pay his bills. He will likely require two future surgeries with recovery periods.

Morris must be returned as nearly as possible to his pre-injury status. In Re: Superior Construction Co., 445 F.3d 1334, 1346-47 (11th Cir. 2006). Morris may claim non-economic damages for pain, suffering, and mental anguish. Moran, 164 F.Supp. at 884; Sweeney v. Car/Puter International Corp., 521 F.Supp. 276, 288 (D.S.C. 1981). Based on awards for comparable injuries in other cases, Morris claims **$70,000.00** for past non-economic damages and **$70,000.00** for future non-economic damages. Compare, Markland v. Norfolk Dredging Co., 772 F.Supp. 1241, 1243 (M.D.Fla. 1991) ($500,000 in non-economic damages); Davis v. Cove Shipping, Inc., 1998 U.S. Dist. Lexis 3303 (E.D.La. March 13, 1998) ($200,000 in non-economic damages) (copy attached); Crum v. United States, 2000 U.S. Dist. Lexis 9598 (E.D.La. July 6, 2000) ($30,000 in non-economic damages) (copy attached).

s/ Nicholas E. Karatinos
Florida Bar No. 109742
Law Office of Nicholas E. Karatinos
18920 North Dale Mabry Highway, Suite 102
Lutz, Florida 33548

(813) 345-5945 (telephone)
(813) 949-0373 (telefax)
nek1720@aol.com
Co-Counsel for Plaintiff

s/ Theodore "Ted" E. Karatinos
Florida Bar No. 983209
Holliday, Bomhoff & Karatinos, P.L.
18920 North Dale Mabry Highway, Suite 101
Lutz, Florida 33548
(813) 868-1887 (telephone)
(813) 909-8535 (telefax)
tedkaratinos@hbklawfirm.com
Co-Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Plaintiff's Post-Trial Brief has been served electronically via the CM/ECF system on March 23, 2009 to Defendants' counsel of record.

s/ Nicholas E. Karatinos



**SAMUEL DAVIS versus COVE SHIPPING, INC.**

**CIVIL ACTION NO. 96-3518 SECTION: E/2**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

**1998 U.S. Dist. LEXIS 3303**

**March 13, 1998, Decided**
**March 13, 1998, Filed, Entered**

**DISPOSITION:** [*1] Motion of defendants Cove Shipping Services, Inc. and Cove Liberty Corporation for new trial, relief from judgment, and/or remittitur DENIED. Motion of defendants to alter and/or amend the judgment GRANTED. Judgment entered in favor of plaintiff Samuel Davis, and against defendants Cove Shipping Services, Inc. and Cove Liberty Corporation, in the true sum of TWO HUNDRED TEN THOUSAND TWO HUNDRED FORTY-EIGHT AND 00/100 DOLLARS ($ 210,248.00).

**COUNSEL:** For SAMUEL DAVIS, plaintiff: Lester J. Waldmann, Clark Richard, Waldmann & Harrington, Gretna, LA.

For COVE LIBERTY CORPORATION, COVE SHIPPING SERVICES, INC., defendants: Charles Felician Lozes, Laurence R. DeBuys, Terriberry, Carroll & Yancey, New Orleans, LA.

**JUDGES:** MARCEL LIVAUDAIS, JR., United States District Judge.

**OPINION BY:** MARCEL LIVAUDAIS, JR.

**OPINION**

*RULING ON MOTIONS*

Defendants, Cove Shipping Services, Inc., ("Cove Shipping"), and Cove Liberty Corporation, ("Cove Liberty"), have filed post-judgment motions with the Court seeking either a new trial, relief from judgment, remittitur and/or alteration and amendment of judgment. Plaintiff, Samuel Davis ("plaintiff"), opposes these post-judgment motions.

*FACTUAL AND PROCEDURAL* [*2]

*BACKGROUND*

Plaintiff filed suit against Cove Liberty, the owner and operator of the M/V COVE LIBERTY, alleging general maritime law unseaworthiness, and Cove Shipping, his employer, alleging Jones Act negligence. This suit arose due to injuries sustained by plaintiff while using the polishing/grinding machine aboard the vessel M/V COVE LIBERTY.

At trial by jury on February 2 and 3, 1998, testimony and exhibits were admitted into evidence from all litigants. Guided by the jury charges and special interrogatories, the jury deliberated upon the evidence presented to the Court. Upon completion of the deliberations, the jury returned its verdict in the form of special interrogatories. The jury found no contributory negligence on the part of plaintiff, and returned a 50% assessment of liability to each defendant, awarding general damages for past and future pain and suffering in the lump sum of $ 200,000.00.

Previously, the parties had stipulated that plaintiff's past lost earnings totaled $ 10,248.00. On February 4, 1998, the Court entered judgment for $ 210,248 against defendants. Defendants then filed a motion requesting a new trial, relief from judgment and/or remittitur. A motion [*3] to alter and amend the judgment was subsequently filed by defendants. Defendants, in burning the motion for new trial, relief from judgment and/or remittitur, essentially contend that plaintiff's verdict was based upon his own perjured testimony and was against the great weight of the evidence. Regarding the motion to alter and amend the judgment, defendants request that the prejudgment interest portion of the Court's judgment be modified. Both motions will be addressed by the Court at this time.

*ANALYSIS*

## A. NEW TRIAL/RELIEF FROM JUDGMENT

Pursuant to FRCP 59, a new trial may be granted if the district court finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *Smith v. Transworld Drilling Co.*, 773 F.2d 610 (5th Cir. 1985). In considering such a motion, the district court is to respect the jury's collective wisdom and must not simply substitute its opinion for that of the jury; however, if the trial judge is not satisfied with the verdict of the jury, he has the right and duty to set the verdict aside and order a new trial. *Id*. Although [*4] a trial judge has this discretion, the court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result, or that its verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. *Fernandez v. Corporation Insular De Seguros*, 79 F.3d 207 (1st Cir. 1996); *Purnell v. Lord*, 952 F.2d 679 (2nd Cir. 1992). In other words, a trial judge cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial. *Reichenpfader v. Paccar, Inc.*, 872 F. Supp. 328 (E.D. La. 1994).

In the instant matter, Cove liberty and Cove shipping contend that plaintiff's verdict was procured through his own perjured testimony. At trial, plaintiff contended that his gloves were inadequate and should have been provided by the vessel owner. Defendants contend that this was contrary to his deposition testimony wherein he stated that he felt he had all the safety gear he needed to do the job. Defendants submit that the jury would have decided the case differently if plaintiff had not lied about the adequacy of his gloves. Defendants also point to [*5] a number of other statements made by plaintiff during the course of trial that they allege conflicted with his pre-trial testimony. Plaintiff, in response, maintains that his deposition testimony regarding the gloves was the same as that given at trial.

Simply stated, the Court finds that the granting of a new trial on these grounds is not warranted. Defense counsel had an ample opportunity to cross-examine and impeach the testimony of plaintiff. Indeed, defense counsel did vigorously cross-examine plaintiff in an attempt to impeach his testimony. The veracity of the statements made by plaintiff at trial were a credibility determination for the jury to resolve.

Further, Davis did testify in his deposition that he was using cotton gloves that he purchased himself because there were none available on the vessel. In addition, Mr. Spinnichio, plaintiffs' immediate supervisor, testified at trial that no gloves were provided because he felt the use of gloves while operating the polishing wheel could be dangerous. Plaintiff, on the other hand, testified that the vessel should have provided gloves, and that the ones he purchased were inadequate. Whether the gloves plaintiff had were adequate, [*6] and whether or not the ship should have undertaken the responsibility to provide such safety equipment was a question of fact for the jury to decide. The jury in this matter deliberated over all the evidence presented, made credibility determinations and came to a conclusion regarding the liability of defendants Cove Shipping and Cove Liberty. The jury was free to settle upon which witness they believed. The Court does not find that the jury in this case reached a seriously erroneous result, or that its verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. As such, verdict of the jury will not be disturbed, and the motion for new trial or relief from judgment will not be granted on these grounds.

A new trial has also been requested based on the argument that the jury award was excessive in this case. When a new trial is requested because the amount of the verdict is excessive or inadequate, the motion should not be granted unless the verdict is against the great weight, not merely the preponderance, of the evidence. *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982 (5th Cir. 1989).

The jury in this case awarded plaintiff [*7] general damages for past and future pain and suffering in the amount of $ 200,000.00. Pursuant to an agreed upon stipulation regarding lost wages, the total judgment entered against defendants Cove Shipping and Cove Liberty was $ 210,248.00. The lost wages portion of the award was stipulated to, and obviously not the basis of defendants' objections. The defendants submit that the general damage award for past and future pain and suffering in the amount of $ 200,000.00 was unconscionable.

At trial, plaintiff's treating physician testified that the type of injury plaintiff suffered to his hand was especially painful. The accident removed part of the flesh padding exposing the nerve endings in the tip of his finger. This resulted in nerve damage. Plaintiff testified that immediately after the accident, he could not dress or feed himself. Plaintiff's physician also noted that while he had experienced significant improvement, his condition is most probably permanent. Although plaintiff, at the time of trial, was back at work, he testified that the injury interferes with his enjoyment of life's simple pleasures, causes constant pain, and prevents him from working in comfort. He also testified [*8] that his hand is now sensitive to temperature and pressure changes. The Court has already determined that a new trial is not warranted on other grounds. Likewise, the Court finds that a new trial is not warranted due to an excessive award in this case. The Court does not find that such an award was against the great weight of the evidence presented to the jury in this case.

## B. REMITTITUR

Defendants have also requested a remittitur. The Court has the right to reduce the award to the maximum amount that a reasonable jury could have properly awarded based on the evidence presented. *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). The award of the jury, however, should not be disturbed unless it is entirely disproportionate to the injury sustained. *Seidman v. American Airlines, Inc.*, 923 F.2d 1134, 1141 (5th Cir. 1991). Further, pain and suffering and other non-economic considerations are, however, to a large degree, insusceptible of monetary quantification, and the jury thus has especially broad leeway. *Id.*

Upon consideration of the matter, taking into account all of the evidence presented and giving the jury its due deference, [*9] the Court does not find that the award should be reduced. Although the award is a bit high, the Court cannot say that a reasonable jury could not have possibly awarded this amount. Thus, the Court does not find remittitur to be appropriate.

## C. ALTERATION/AMENDMENT OF JUDGMENT

Defendants Cove Liberty and Cove Shipping also object to the Court's award of prejudgment interest against general maritime law Cove Liberty on the whole amount of the judgment. Prejudgment interest is not available in an action at law under the Jones Act, but is available in an action at law under the general maritime law if there is an evidentiary basis for distinguishing damages caused by the Jones Act negligence from those caused by general maritime law unseaworthiness. *Melancon v. Petrostar Corp.*, 762 F. Supp. 1261 (W.D. La. 1991). Put another way, when a damage award is based on a jury verdict finding of both Jones Act negligence and general maritime law unseaworthiness, an award of prejudgment interest is not permitted if there is no basis for determining what portion of the damage award is based on which theory of recovery. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372 (5th Cir. [*10] 1989). In the instant matter, the jury did distinguish what portion of the damage award was based on which theory of recovery. The jury assessed 50% liability to each defendant; therefore, the Court determined that there be prejudgment interest assessed against defendant Cove Liberty Corporation, the owner of the vessel, from December 30, 1993 (the date of the casualty) and against defendant Cove Shipping Services, Inc., plaintiff's Jones Act employer, from the date of entry of judgment.

Defendants, however, take issue with the failure to distinguish between past versus future damages of plaintiff on the interrogatory form. It is well-established that prejudgment interest may not be awarded with respect to future damages. *Couch v. Cro-Marine Transport, Inc.*, 44 F.3d 319 (5th Cir. 1995). Defendants contend that the only element of damages that clearly represents a past loss is the stipulated past lost wages of $ 10,248.00. With respect to the remainder of the judgment totaling $ 200,000.00, the jury interrogatory form simply reflected that the jury award an amount for past and future pain and suffering.

In both bench trials and jury trials where prejudgment interest was [*11] improperly awarded as to the entire award, the Fifth Circuit has typically remanded the matters back to the district court for an allocation of the award into past and future damages. *Couch*, 44 F.3d at 328; *Boyle v. Pool Offshore Co.*, 893 F.2d 713, 719 (5th Cir. 1990). The Court recognizes that it has the discretion to find that plaintiff has waived his right to prejudgment interest because he did not object to the form of the jury interrogatory. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 362 (5th Cir. 1991); *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 891 (5th Cir. 1993). However, the Court feels that this would be a harsh remedy and is not inclined to punish plaintiff. The Court is of the opinion that the evidence presented at trial is sufficient to allow the Court to determine what percentage of the jury's pain and suffering award represented past losses.

The Court finds that 50% of the jury's award should be allocated to past pain and suffering. As stated earlier, at trial testimony was heard that the injury plaintiff suffered to his hand was especially painful. The accident removed part of the flesh padding exposing the nerve endings in the tip of his [*12] finger, resulting in nerve damage. A stack splint had to be used to keep anything from touching the wound during the healing process. Plaintiff testified that immediately after the accident, he could not dress or feed himself. Plaintiff also testified as to how the injury interfered with his daily work routine, and the pain he suffers due to weather changes. Although plaintiff experienced a significant amount of past pain and suffering, his physician also noted that his condition is most probably permanent. Thus, the Court finds that an apportionment of 50% fault for past pain and suffering is consistent with the evidence.

The judgment will be so amended.

Accordingly, for the above and foregoing reasons,

**IT IS ORDERED** that the motion of defendants Cove Shipping Services, Inc. and Cove Liberty Corporation for new trial, relief from judgment, and/or remittitur be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the motion of defendants to alter and/or amend the judgment be and is hereby **GRANTED**. Judgment shall be so amended.

New Orleans, Louisiana, March *13*, 1998.

MARCEL LIVAUDAIS, JR.

United States District Judge

*SECOND AMENDED JUDGMENT*

[*13] Considering the record, the answers by the jury to the interrogatories propounded to it by the Court, the direction of the Court as to entry of judgment, the law, and the order granting an amendment of judgment, for the reasons assigned,

**IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment herein in favor of plaintiff Samuel Davis, and against defendants Cove Shipping Services, Inc. and Cove Liberty Corporation, in the true sum of **TWO HUNDRED TEN THOUSAND TWO HUNDRED FORTY-EIGHT AND 00/100 DOLLARS ($ 210,248.00).**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be interest assessed against defendant Cove Liberty Corporation from December 30, 1993 (the date of the casualty) with respect to $ 110,248.00 of the judgment. As to the remainder of the judgment, interest shall be assessed against Cove Liberty Corporation from the date of entry of judgment.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that there be interest assessed against defendant Cove Shipping Services, Inc. from the date of entry of judgment, and costs.

New Orleans, Louisiana, March 13, 1998.

MARCEL LIVAUDAIS, JR.

United States District Judge



## PETER CRUM VERSUS UNITED STATES OF AMERICA

### CIVIL ACTION NO: 99-2178 SECTION: "C"

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

### 2000 U.S. Dist. LEXIS 9598

### July 6, 2000, Decided
### July 5, 2000, Filed; July 6, 2000, Entered

**COUNSEL:** [*1] For PETER CRUMB, plaintiff: Darleen Marie Jacobs, Darleen M. Jacobs, Attorney at Law, New Orleans, LA.

For UNITED STATES OF AMERICA, defendant: Kevin J. LaVie, Terriberry, Carroll & Yancey, New Orleans, LA.

**JUDGES:** HELEN G. BERRIGAN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** HELEN G. BERRIGAN

**OPINION**

This matter was tried before the Court, without a jury, on June 29, 2000, and taken under advisement. Having considered the evidence and testimony adduced at trial, the record, the memoranda of counsel and the law, the Court now issues its opinion.

*FINDINGS OF FACT and CONCLUSIONS OF LAW*

1. The plaintiff, Peter L. Crum (hereinafter "Crum"), filed this suit for damages arising out of an alleged April 27, 1999, accident while working as a seaman aboard the USNS ALGOL. The USNS ALGOL was a public vessel of the defendant United States of America and was operated by Bay Ship Management, Inc. as an agent of the defendant. Crum's maritime status is uncontested. Jurisdiction is found under admiralty and maritime law. 28 U.S.C. § 1331, et seq. Venue is likewise proper.

2. Crum signed on to the USNS ALGOL as Chief Cook on April 19, 1999. At the time of the alleged [*2] accident, Crum was 33 years old, a merchant seaman with at least 10 years of experience, virtually all as a member of the galley crew. He previously had served with the United States Navy.

3. On April 27, 1999, Crum and his superior Chief Steward Raymond Brown (hereinafter "Brown") were on cleaning duties in the vessel's galley. The two were responsible for cleaning all the cooking equipment, galley bulkheads, and the freezer box. It was during the performance of these responsibilities that grease from the deep-fat fryer spilled on the galley floor.

4. According to Brown's deposition, which the Court finds credible, the deep-fat fryer on the USNS ALGOL was defective because the spring "kick-stand" mechanism that holds the heating element during the cleaning process was missing. The vessel was without the spring device when Brown signed on to the USNS ALGOL on December 7, 1998. Brown further testified the chief engineer and captain of the vessel knew of the defect and no remedy had been implemented. As a result of the missing spring mechanism, a substitute stand for the heating element was improvised from a small bowl called a "monkey dish." As Brown was in the process of [*3] removing the grease pan from the fryer, the "monkey dish" was jarred, causing the heating element to fall back into the grease. A sizeable quantity of grease splashed to the floor and on Crum's coveralls.

5. The Court finds that Crum did in fact slip on the grease and fall, in some manner, to the floor. A conflict exists between the testimony of Brown and the plaintiff as to how soon after the grease spilled the accident occurred. Brown testified that some 20-30 minutes passed and Crum did not slip until after they had partially cleaned up the spill. Crum claims he slipped immediately after the grease spilled on the floor. The Court finds Brown's testimony to be more credible. Brown was not shown to have a bias towards either party nor shown to have any reason not to testify truthfully. Crum, on the other hand, faces the burden of contributory negligence

unless the accident occurred immediately.

6. Both Crum and Brown participated in cleaning up the grease spill prior to the accident. They used warm water and Top Job but it was not, as Brown conceded, a "thorough clean." Brown as the supervising employee made the decision to delay a more thorough cleaning of the floor until [*4] after they had finished the clean up of the rest of the galley. After their partial clean-up of the grease, the grease was still visible on the floor. Crum, with over ten years experience working in a ship galley, was familiar with spills and had experience in how to walk carefully over them.

7. There were strips of nonskid material in various places on the floor. Brown testified to this and the photographs showed some of those strips. Plaintiff expert David Cole based his opinion on the assumption there was no slip-resistant protection in the galley. This assumption was factually incorrect so his opinion has been disregarded.

8. The Court concludes that Crum proved that he injured his knee in the accident but failed to prove that he also injured his back and ankle at that time. Crum testified at trial that he felt immediate stabbing type pains in his back as well as pain in his ankle which continued throughout his tour of duty on the vessel. The Court finds this testimony lacking in credibility for the following reasons. Brown testified that after the accident, Crum complained several times that his leg or his knee was injured, but did not mention his back nor his ankle. [*5] Rodney Robinson, who came upon the accident scene shortly after it occurred, likewise testified that Crum complained only of pain in his leg. Likewise he continued to work for several more days, including overtime. He did not file an accident report nor apparently complain of pain to anyone, including the captain who gave him his pay. Brown testified that Crum did not appear to be in serious pain. Finally, when Crum visited the Emergency Room a week after the accident, he only reported an injury to his knee to Dr. Terry Rivers. The Court credits the testimony and notes of Dr. Rivers that Crum did not claim he had injured his ankle. Crum himself concedes he did not complain to the physician of any injury to his back. It was only after consultation with an attorney and a visit to the physicians recommended by the attorney that Crum claimed to have injured his back and ankle also in the accident. The Court finds his testimony not persuasive on that issue.

9. The Court also credits Dr. Rivers' notes and testimony that Crum told him he had injured his knee originally a week before, on board a ship, and re-injured it the day prior to seeking emergency room assistance.

10. As a [*6] result of the injury to the knee, Crum suffered a torn meniscus. This condition caused some instability, pain and some swelling. According to Dr. James Ghadially, this condition created an approximate impairment rating of 8%. Dr. Ghadially also testified that Crum needs arthroscopy of the knee to alleviate his problems. Dr. Ghadially testified that this is a "relatively minor procedure" and "for the most part these patients do very well from their knee surgery and have only very minor limitations." He estimated the total cost of surgery plus rehabilitation at $ 15,000-$ 18,000. He testified that a "couple of months" of physical therapy would follow the surgery.

11. The Court finds that the injury to the knee was not serious enough at any time to prevent Crum from returning to full status duty as a member of a galley crew. This conclusion is based on the fact that Crum continued working for three full days, plus overtime, after the accident and it is also based on the testimony with respect to Crum's symptoms and therapy by Dr. Ghadially, Ronald Handwerger and Dr. Rivers. It is also based on Crum's own description of the galley duties, which apparently require minimal physical [*7] effort, and the fact that he passed his physical and returned to work in January of this year. Consequently, Crum is not entitled to maintenance during the period of time he was not working. Nor he is entitled to past wage loss. If Crum elects to have arthroscopic surgery on his knee, he would be entitled to future maintenance during the period of rehabilitation, up to two months, and two months worth of lost wages.

12. A seamen has a light burden of proof of causation for negligence under the Jones Act. 46 U.S.C. § 688. The plaintiff must prove that his employer's breach of duty was the cause "in whole or in part" of his injury. 46 U.S.C. § 688; See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997), Gavagan v. United States, 955 F.2d 1016, 1019 (5th Cir. 1992). This burden to show causation "in whole or in part" is identical to that required of railroad worker plaintiffs under Section 51 of the Federal Employer's Liability Act ("FELA"). 45 U.S.C. § 51. See Gautreaux, 107 F.3d at 335. The Supreme Court has explained that under the FELA standard [*8] the seaman must only prove the employer bore the "slightest" responsibility for the injury. See Id., quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 448, 1 L. Ed. 2d 493 (1957)

A seaman proceeding under a cause for unseaworthiness has a more difficult burden of proof for causation. See Smith v. Trans-World Drilling Company, 772 F.2d 157, 162 (5th Cir. 1985), Johnson v. Offshore Express, 845 F.2d 1347 at 1354 (5th Cir. 1988), Gavagan v. United States, 955 F.2d 1016 1019 (citing Johnson in FN7). "[A] plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Johnson v. Offshore Express, Inc.,

845 F.2d at 1354.

13. The Court concludes that the defendant is 80% responsible for the accident. This is based on the following: (1) the fryer contained a longstanding defect in that the heating element could not be held stable while aloft while the fryer was being cleaned. This failure to repair the fryer [*9] was both negligence and an unseaworthiness condition. Under either standard, the defect was a substantial cause of the accident; (2) Supervisor Brown elected not to thoroughly clean the grease spill, but deferred until the entire galley had been cleaned. This was negligence and a cause of Crum's subsequent slip and fall. Crum is 20% responsible for the accident in that he was aware of the grease spill, the grease was visible, he had experience in working in such conditions, yet failed to take all necessary precautions to maintain his balance.

14. Dr. Rivers' notes indicate Crum told him he had re-injured his knee since the original accident a week before. Crum denies both re-injuring his knee as well as saying such to Dr. Rivers. While the Court does not find Crum to be credible on that point, the Court also has no way to measure the seriousness of the re-injury and what percentage to apportion to that unknown incident. Nowhere else in the record does the issue of the alleged re-injury appear. Considering that Crum did establish a bona fide accident on the vessel and since he did immediately complain of injury to his knee to Brown and Robinson, the Court will find that the torn [*10] meniscus did occur at that time and that any re-injury was insignificant.

15. With respect to pain and suffering, the Court finds that an award of $ 18,000.00 is reasonable in general damages, including pain and suffering, past and future, resulting from the injury to the knee if Crum elects not to have the arthroscopic surgery. If Crum elects to have the arthroscopic surgery, this amount would be increased by $ 12,000.00 for a total of $ 30,000. This amount is to be reduced in accordance with the percentage of fault attributed to Crum.

16. With respect to future medical expenses, the Court finds that the defendant is responsible for paying for Crum's arthroscopic surgery to his knee and rehabilitation, if he elects to have the surgery in an amount no greater than $ 18,000. That decision must be made within 60 days of this opinion. In the event surgery is undertaken, the plaintiff is entitled to a total maintenance award of $ 480, representing the contract rate of $ 8.00/day for 60 days. In addition, the Court finds that the plaintiff would be entitled to two months lost wages in the event of surgery, for a total of $ 6,500, approximately based on the plaintiff's economist's [*11] base earning figure. However, no award for lost fringe benefits is made for this two month recovery period, based on the speculative nature of the evidence provided on this item.

17. With respect to past medical expenses, the Court is unable from the record presented to determine what expenses are attributable to the knee injury as compared to those attributable to the back and ankle. The plaintiff may re-submit revised bills for make that allocation within 60 days of this opinion. The Court urges both parties to settle that particular issue.

Accordingly,

IT IS ORDERED that the plaintiff advise the Court in writing within 60 days of his intent with regard to having arthroscopic surgery on his knee as recommended by his doctor, and that the parties re-submit the past medical bills which concern the knee injury within that time.

New Orleans, Louisiana, this 6 day of July, 2000.

HELEN G. BERRIGAN

UNITED STATES DISTRICT JUDGE